O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

The People of the State of California, *et al.*,

Plaintiffs,

v.

Chiquita Canyon, LLC, *et al.*,

Defendants.

Case No.: 2:24-cv-10819-MEMF-MAR

**ORDER REGARDING DEFENDANTS' MOTION TO DIMISS [ECF NO. 33] AND THE PARTIES' REQUESTS FOR JUDICIAL NOTICE [ECF NOS. 33-2, 43-3, 45-1]**

Before the Court is the Motion to Dismiss (ECF No. 33), Request for Judicial Notice (ECF No. 33-2), and Supplemental Request for Judicial Notice (ECF No. 45-1) filed by Defendants Chiquita Canyon, LLC, Chiquita Canyon, Inc., and Waste Connections US, Inc. Also before the Court is the Request for Judicial Notice filed by Plaintiffs the People of the State of California and the County of Los Angeles (ECF No. 43-3). For the reasons stated herein, the Court GRANTS IN PART Defendants' Motion to Dismiss, GRANTS IN PART Defendants' Request for Judicial Notice, GRANTS IN PART Defendants' Supplemental Request for Judicial Notice, and GRANTS Plaintiffs' Request for Judicial Notice.

**BACKGROUND**

I.    **Factual Background**[1]

A.    The Parties

Plaintiff the County of Los Angeles ("County") is a political subdivision of the State of California and a charter county organized and existing under the constitution and laws of the State of California. Compl. ¶ 12. Plaintiff the People of the State of California ("People"; together with the County, "Plaintiffs") brings this action by and through the County's Office of the County Counsel. *Id.* ¶ 13.

Defendant Chiquita Canyon, LLC ("Chiquita LLC") is a limited liability company organized and existing under the laws of the state of Delaware with its principal place of business in Texas. *Id.* ¶ 14. Defendant Chiquita Canyon, Inc. ("Chiquita Inc.") is a corporation organized and existing under the laws of the state of Delaware with its principal place of business in Texas. *Id.* ¶ 15. Defendant Waste Connections US, Inc. ("Waste Connections"; together with Chiquita LLC and Chiquita Inc., "Defendants") is a corporation organized and existing under the laws of the state of Delaware with its principal place of business in Texas. *Id.* ¶ 16. Waste Connections is the sole owner of Chiquita Inc., which in turn is the sole member of Chiquita LLC. *Id.* ¶¶ 18, 19. Waste Connections exercises significant control over Chiquita LLC and Chiquita Inc. *Id.* ¶ 17.

B.    Background on the Landfill

Chiquita LLC is the record owner of the 639-acre land at 29201 Henry Mayo Drive in the unincorporated community of Castaic, California. *Id.* ¶¶ 20, 23. Chiquita LLC obtained a conditional use permit ("CUP") from the County to operate a landfill at the site ("Landfill"). *Id.* ¶ 21. Chiquita Inc. and Waste Connections also operate the Landfill. *Id.* Waste Connections's employee operate the Landfill and represent the Landfill before regulatory and governmental entities. *Id.*

---

[1] The following factual allegations are derived from the allegations in Plaintiffs' Complaint, ECF No. 1 ("Complaint" or "Compl."), unless otherwise indicated. For the purposes of this Motion, the Court treats these factual allegations as true, but at this stage of the litigation, the Court makes no finding on the truth of these allegations, and is therefore not—at this stage—finding that they *are* true.

1    The Landfill is a Class III waste disposal facility[2] that accepts nonhazardous residential and

2    commercial solid wastes. *Id.* ¶ 26. The Landfill also operates a landfill gas collection and control

3    system, including gas collection wells and headers, blowers for venting gas, systems for treating

4    landfill gas and collecting condensate and leachate, and flares for combusting landfill gas. *Id.* ¶ 30.

5    The County first approved the Landfill under a CUP in 1965. *Id.* More recently, on July 25,

6    2017, the Los Angeles County Board of Supervisors approved the Landfill's operative CUP 2004-

7    00042-(5). *Id.* ¶ 28. During review of CUP 2004-00042-(5), the Landfill was considered to be a

8    potential source of extreme environmental impacts and community concern, requiring significant

9    mitigation and close monitoring to protect the area. *Id.* ¶¶ 31, 32. As a result, CUP 2004-00042-(5)

10   contained detailed conditions of approval to ensure that the Landfill is operated safely and in a way

11   that avoids or mitigates any potential nuisance to the surrounding community. *Id.* ¶ 33.

12          C.   Noxious Reaction at the Landfill

13   The Landfill is experiencing the "Noxious Reaction"—a continuing, uncontrolled,

14   underground, smoldering reaction—which causes noxious odors and gases to be released into the

15   surrounding communities. *Id.* ¶ 35. The Noxious Reaction began underground in May 2022 in an

16   approximately 30-acre inactive area in the northwestern portion of the Landfill ("Reaction Area").

17   *Id.* ¶ 36. It has since grown in size. *Id.*

18   According to the California Department of Resources, Recycling, and Recovery

19   ("CalRecycle") and the United States Environmental Protection Agency ("USEPA"), the Noxious

20   Reaction is characterized by, among other things, significant issues with the integrity of the Landfill

21   cover, increased landfill gas temperatures and subsurface temperatures, a change in the chemical

22   composition of landfill gas, intrusion of excess oxygen into the landfill waste, unusual settlement

23   within the Landfill, and damage to and poor performance of gas wells. *Id.*

24   The Noxious Reaction has caused increased emissions of landfill gas and odors from the

25   surface of the Landfill, exceeding the Landfill's designated gas generation flow rate. *Id.* ¶ 38. The

26

27   ───────────────

28   [2] A Class III landfill is one that accepts non-hazardous municipal solid waste. Compl. ¶ 29. The solid waste
     accepted at the Landfill includes municipal solid waste, residential and commercial waste, green waste for
     composting or recycling, construction and demolition debris, and e-waste for recycling. *Id.*

1    emissions into the surrounding air due to the Noxious Reaction include but are not limited to

2    hydrogen sulfide, benzene, sulfur, dimethyl sulfide, methane, and carbon monoxide. *Id.* ¶ 39. These

3    chemicals can cause harmful health effects. *Id.*

4    The Noxious Reaction has also caused increased production of Landfill leachate (a liquid

5    formed when rainwater filters through and draws out chemicals or constituents from landfill wastes

6    and then seeps out of the landfill), as well as elevated leachate temperatures. *Id.* ¶ 41. Regulators

7    inspecting the Noxious Reaction observed leachate bubbling, boiling, or shooting out from the

8    Landfill, sometimes as high as twelve to eighteen feet in the air. *Id.* The pooled and flowing

9    leachate, some of which has been found to contain elevated levels of hazardous chemicals such as

10   benzene, creates additional fumes and foul-smelling odors. *Id.*

11           D.  <u>Impact of the Noxious Reaction on Surrounding Communities</u>

12   The Landfill is near numerous residential communities where thousands of people make their

13   home. *Id.* ¶¶ 24, 37. There are also commercial and industrial areas around the Landfill. *Id.* ¶ 25.

14   Defendants did not alert the nearby communities when the Noxious Reaction began, and the

15   local residents only became aware when they started noticing odors from the Landfill. *Id.* ¶ 42.

16   The local residents have experienced and continue to experience health effects, including

17   headaches; nausea; eye, nose, throat, and skin irritations; dizziness; difficulty breathing; and cardiac

18   problems. *Id.* ¶ 44. The mental stress from living with these odors can be heavy, leading to feelings

19   of helplessness, sadness, anxiety, and depression. *Id.* ¶ 45.

20   Since January 2023, the South Coast Air Quality Management District (the "South Coast

21   AQMD")—the agency responsible for air quality and pollution control in the South Coast Basin—

22   began receiving complaints from local residents about noxious fumes coming from the Landfill. *Id.* ¶

23   46. These complaints steadily increased throughout 2023 and 2024, with the South Coast AQMD

24   receiving more than 25,000 such complaints in total. *Id.* A summary of these complaints, compiled

25   by the USEPA in a Unilateral Administrative Order ("UAO") issued in February 2024, notes that the

26   complaints include "reports of eye irritation, nosebleeds, tinnitus, nausea, migraines, vomiting,

27   vertigo, respiratory symptoms, cardiac issues, and skin issues." *Id.* ¶ 48. Results from the surveys

28   conducted by the County's Department of Public Health ("DPH") show that many of the responding

1   residents still observe "very strong" or "strong" odors that prevent them from going outside and/or

2   make them feel ill. *Id.* ¶ 51. Defendants are aware of and admit that the Noxious Reaction at the

3   Landfill has caused serious adverse effects in the surrounding community.[3] *Id.* ¶ 53.

4          E.   Regulatory Agencies' Responses to the Noxious Reaction

5          For close to two years, numerous Federal, State, and local agencies and governmental entities

6   charged with protecting the communities' air, water, health, and proper disposal of waste have

7   investigated and engaged in enforcement efforts regarding the Noxious Reaction and its effects. *Id.* ¶

8   56. These entities include the South Coast AQMD; the California Environmental Protection Agency

9   and four sub-departments, including CalRecycle, the Los Angeles Regional Water Quality Control

10  Board ("Water Board"), the Department of Toxic Substances Control ("DTSC"), and the California

11  Air Resources Board; the USEPA; as well as County Departments including the DPH (certified by

12  CalRecycle to act as the local enforcement agency for the Noxious Reaction) and the County's

13  Department of Regional Planning. *Id.* ¶ 57. In November 2023, these entities formed a Multi-Agency

14  Critical Action Team ("MCAT"), led by the USEPA, to coordinate their investigations and

15  enforcement efforts. *Id.* ¶ 58. These entities' investigations have led to hundreds of notices of

16  violation and other administrative orders based on violations of multiple federal, state, and local

17  regulations regarding Landfill operations.[4] *Id.* ¶ 59. Mitigation measures have been ordered to

18  remedy the Noxious Reaction and protect the public health and environment from the detrimental

19  effects thereof. *Id.* ¶ 59.

20         **South Coast AQMD**: On May 18, 2023, the South Coast AQMD issued an initial Notice of

21  Violation ("NOV") to the Landfill for public nuisance in violation of South Coast AQMD Rule 402

22  and California Health and Safety Code section 41700. *Id.* ¶ 63. The South Coast AQMD

23  subsequently issued over 200 additional NOVs to the Landfill and cited the Landfill for violation of

24  other rules and regulations. *Id.* ¶ 67. In September 2023, the South Coast AQMD issued a Stipulated

25

26  _____

27  [3] The Landfill's website states that "Chiquita fully recognizes that neighboring communities are suffering
    odor-related impacts as a result of the [Noxious Reaction]," and that "odors may cause short-term health
    impacts or may otherwise affect quality of life." Compl. ¶ 54. Defendants also state that the uncontrolled

28  Noxious Reaction "may continue for years." *Id.*
    [4] These entities will be collectively referred to as the "MCAT Agencies."

Order for Abatement, ordering Defendants to comply with forty different "conditions and increments of progress" to address the issues created by the Noxious Reaction. *Id.* ¶ 68. In November 2023, the South Coast AQMD also cited the Landfill for failing to properly maintain its leachate collection and storage system in good operating condition, failing to report equipment breakdown, failing to submit an excavation plan for the Landfill, and other violations. *Id.* ¶ 69. A recent modification of the Stipulated Order for Abatement in November 2024 ordered Defendants to take stricter remedial measures to reduce the noxious odors from the Noxious Reaction. *Id.* ¶ 72. Since the November 2024 modification of the Stipulated Order for Abatement, the South Coast AQMD has issued at least ten additional NOVs to the Landfill. *Id.* ¶ 73.

**CalRecycle[5]**: After a review of the Noxious Reaction, CalRecycle suggested mitigation measures to resolve these issues, such as repairs and improvements to the cover around the Reaction Area. *Id.* ¶ 77. The DPH, which CalRecycle certified to act as the local enforcement agency, mandated that the Landfill implement these suggested remedial measures in an October 17, 2023 letter to the Landfill management. *Id.* ¶ 78. On November 14, 2023, CalRecycle reported to the DPH that several mitigation measures had not been implemented by the Landfill and recommended that the Landfill take additional actions to mitigate the effects of the Noxious Reaction. *Id.* ¶ 79. On May 15, 2024, CalRecycle placed the Landfill on the Inventory of Solid Waste Facilities Which Violate State Minimum Standards after issuing a Notice of Intent to do so on February 8, 2024, and providing a ninety-day correction period, which passed without the violations being remedied. *Id.* ¶ 80. On December 2, 2024, CalRecycle sent a letter to the DPH after reviewing Defendants' proposed revised remediation plan. *Id.* ¶ 81. CalRecycle found certain portions of this plan inadequate, including its timeline. *Id.* CalRecycle also raised questions about the integrity of the Landfill's geosynthetic liner and requested additional data from the Landfill. *Id.*

**Water Board[6]**: The Water Board's October and November 2023 inspections of the Landfill confirmed that leachate was seeping from the Landfill as a result of the Noxious Reaction. *Id.* ¶ 82.

---

[5] CalRecycle regulates non-hazardous solid waste facilities through entities it certifies to act as the local enforcement agency, and which it then monitors and assists with technical and enforcement assistance. Compl. ¶ 74.

[6] The Water Board is responsible for protecting ground and surface water quality. Compl. ¶ 82.

1    The Water Board issued a series of NOVs to Defendants related to the leachate seepage on, *inter*

2    *alia*, November 22, 2023, March 28, 2024, April 9, 2024, and June 27, 2024. *Id.* ¶ 83. On September

3    25, 2024, in light of the Landfill's continued failure to contain the leachate seepage due to the

4    Noxious Reaction, the Water Board reaffirmed a decision denying the Landfill's request to place

5    waste in an additional cell within the Landfill. *Id.* ¶ 84.

6        **DTSC**[7]: The DTSC's testing of the Landfill revealed that the leachate contained elevated

7    levels of benzene. *Id.* ¶ 85. The DTSC issued a Proposition 65 Notice relating to the Landfill on

8    February 16, 2024. *Id.* ¶ 86. The DTSC subsequently issued Summary of Violation notices to

9    Chiquita LLC on February 15, 2024, and March 29, 2024. *Id.* ¶ 87.

10        **DPH**: As the local enforcement agency for CalRecycle, on October 17, 2023, the DPH

11    mandated that the Landfill take several corrective and mitigation actions proposed by CalRecycle.

12    *Id.* ¶ 89. The DPH issued a further letter to the Landfill management on November 21, 2023,

13    requiring additional mitigation measures in response to a further analysis performed by CalRecycle.

14    *Id.* ¶ 90. On February 7, 2024, a Community Air Sampling and Health Risk Screening Evaluation

15    Report prepared by Roux Associates, Inc. on behalf of the County found elevated levels of hydrogen

16    sulfide in the communities surrounding the Landfill, exceeding the recommended limits set by the

17    California Environmental Protection Agency's Office of Environmental Health Hazard Assessment.

18    *Id.* ¶ 91. On June 6, 2024, after monitoring Defendants' progress in implementing the requested

19    mitigation measures and trying for many months to gain compliance, the DPH issued a Compliance

20    Order, noting that methane emitted into the air from the Reaction Area continued to exceed required

21    levels and mandating specific remediation measures and a compliance schedule. *Id.* ¶ 92.

22        Separately from its role as a local enforcement agency, the DPH also issued a Public Health

23    Notice to the Landfill management on July 26, 2023, warning that "rapid action must be taken to

24    minimize or eliminate the odors in order to protect the health and safety of the nearby residents." *Id.*

25    ¶ 94. On August 8, 2023, the DPH issued additional recommendations to the Landfill management

26    regarding mitigation measures that should be taken to alleviate the health impacts of the noxious

27

28    _____
[7] The DTSC regulates California facilities' hazardous waste management to ensure compliance with
environmental laws. Compl. ¶ 85.

odors emanating from the Noxious Reaction. *Id.* ¶ 95. On August 18, 2023, the County Department
of Regional Planning issued a Notice of Violation to Chiquita LLC for violations of certain
conditions of its operative CUP in connection with the Noxious Reaction. *Id.* ¶ 96.

**USEPA**: The USEPA confirmed that the Landfill was experiencing elevated temperatures
and increased leachate production, as well as "ongoing conditions." *Id.* ¶ 98. On February 21, 2024,
the USEPA issued its UAO, finding that the Landfill violated multiple federal laws. *Id.* ¶ 101. The
UAO required the Landfill to comply with the law and take certain enumerated mitigation measures
to address the problems caused by the gas and leachate emissions from the Landfill. *Id.* ¶ 104. On
June 4, 2024, the USEPA issued a Finding of Violation to the Landfill management for violations of
sections 111(e) and 112 of the Clean Air Act, 42 U.S.C. §§ 7411(e) and 7412, due to continuing
emanations of noxious fumes from the Noxious Reaction. *Id.* ¶ 105.

F.    Continuing Effects and Defendants' Failure to Remedy

Despite the concentrated efforts of these regulatory entities, the Noxious Reaction continues
to adversely affect the surrounding community. *Id.* ¶ 60.  Defendants have still not successfully
contained and mitigated the Noxious Reaction to prevent adverse effects on the surrounding
community. *Id.* ¶ 93. Remediation measures taken by Defendants in response to these entities' orders
have not been sufficient, and Defendants have not properly controlled the Noxious Reaction or
mitigated its effects. *Id.* ¶ 109.

**II.    Procedural History**

On December 16, 2024, Plaintiffs filed suit. Compl. Plaintiffs allege the following causes of
action: (1) Public Nuisance – Nuisance Per Se and (2) Public Nuisance. *See generally id.* The People
allege (3) Violation of California Business and Professions Code section 17200, *et seq*. ("UCL").
*See generally id.* The County alleges (4) Violation of Los Angeles County Code sections 1.23.010,
*et seq*., 22.02.030(B), 22.242.020-22.240.040. *See generally id.*

Plaintiffs seek the following relief:

(i)    an injunction ordering Defendants to bring the Landfill into compliance with the Los
Angeles County Code, the operative CUP, and all applicable laws and regulations of
the various local, state, and federal regulatory entities;

(ii)     an injunction requiring Defendants to subsidize the relocation of citizens living in proximity to the Landfill and who are affected by the Noxious Reaction;

(iii)    an injunction requiring Defendants to subsidize the remedial measures certain citizens are required to take to mitigate the effects they are suffering until the Noxious Reaction is extinguished (such as air purifiers, air filtration system, and assistance with utility bills);

(iv)    civil penalties against Defendants pursuant to Los Angeles County Code section 1.23.090 and California Business and Professions Code sections 17206(a); and

(v)     attorneys' fees and costs of suit.

*See generally id.* Plaintiffs alternatively seek (vi) appointment of a receiver if Defendants fail to abate or are incapable of abating the violations at the Landfill. *See generally id.*

On April 3, 2025, the Court consolidated the instant action to *In re Chiquita Canyon Landfill Litigation*, Case No. 2:23-cv-08380-MEMF-MAR ("Lead Case"). ECF No. 42. The consolidation is for discovery purposes only. *See id.*

On February 28, 2025, Defendants filed the instant Motion to Dismiss. ECF No. 33 ("Motion" or "Mot."). Included in the Motion is Declaration of Sarah Phillips. ECF No. 33-18 ("Phillips Declaration" or "Phillips Decl."). The Motion is fully briefed. ECF Nos. 43 ("Opposition" or "Opp'n"), 45 ("Reply").

Defendants also filed a Request for Judicial Notice (ECF No. 33-2, "DRJN"), and a Supplemental Request for Judicial Notice (ECF No. 45-1, "DSRJN"). Plaintiffs filed their own Request for Judicial Notice (ECF No. 43-3, "PRJN"), objections to the DRJN (ECF No. 43-1), evidentiary objections to the Phillips Declaration (ECF No. 43-2), and an objection to the DSRJN (ECF No. 50). Defendants filed their responses to Plaintiffs' objections to the DRJN (ECF No. 45-7) and to the evidentiary objections to the Phillips Declaration (ECF No. 45-8).[8]

On May 29, 2025, the Court held a hearing on the Motion.

---

[8] The Court considered Plaintiffs' Evidentiary Objections and Defendants' responses thereto. The Court did not find the evidence to which Plaintiffs objected essential to the Court's analysis herein. The Court therefore need not reach the Evidentiary Objections.

# REQUESTS FOR JUDICIAL NOTICE

### I.    <u>Applicable Law</u>

A court may judicially notice facts that "(1) [are] generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). A court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2). Once a fact is judicially noticed, the court "must instruct the jury to accept the noticed fact as conclusive." Fed. R. Evid. 201(f).

On a motion to dismiss, courts are generally prohibited from "consider[ing] any material beyond the pleadings," as doing so converts the motion into a motion for summary judgment. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). There are two exceptions: (1) a court may consider "material which is properly submitted as part of the complaint" and (2) a court may take judicial notice of "matters of public record" but not "fact that is subject to reasonable dispute" *Id.* at 688–89 (internal quotation omitted). Documents not attached to the complaint may similarly be considered without converting a motion to dismiss into a motion for summary judgment if: "(1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the document." *See United States v. Corinthian Colleges*, 655 F.3d 984, 998–99 (9th Cir. 2011) (citing *Lee*, 250 F.3d at 688; *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006)).

Courts may take judicial notice of public-facing websites whose accuracy and authenticity are "not subject to dispute." *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1023 (C.D. Cal. 2008) (citing *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994)); *Threshold Enters. Ltd. v. Pressed Juicery, Inc.*, 445 F. Supp. 3d 139, 145–46 (N.D. Cal. 2020) (taking judicial notice of "screenshots and printouts" of the parties' websites). Publicly available documents, including websites, are judicially noticeable "for the fact that they exist" and not for the truth of the matter asserted therein. *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 984 (N.D. Cal. 2010).

The judicially created "incorporation by reference" doctrine provides another avenue through which a defendant may request a court treat "certain documents as though they are of the complaint

itself" for a motion to dismiss. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). "[A] defendant may seek to incorporate a document into the complaint if the plaintiff refers extensively to the document or the document forms the basis for the plaintiff's claim." *Id.* (citing *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003)) (cleaned up). Although a court "may assume an incorporated document's contents are true for purposes of a motion to dismiss . . . it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Id.* at 1003 (cleaned up). A court may, but is not required to, incorporate documents by reference. *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1160–61 (9th Cir. 2012).

## II.    Discussion

Defendants ask this Court to judicially notice Exhibits 1 to 8, *see generally* DRJN, and Exhibits 9 to 13, *see generally* DSRJN. Defendants argue that these Exhibits are judicially noticeable because they are webpages or documents on the Landfill's website (Exhibits 1-A, 1-B, 1-C), public records or government documents available from government websites (Exhibits 2, 4, 5), a compilation of permits or authorizations regarding the Landfill's operations (Exhibits 3-A, 3-B, 3-C, 3-D), a compilation of investigative and enforcement orders and related documents (Exhibits 6-A, 6-B, 6-C, 6-D, 7, 8, 9, 10, 11, 12, 13). *See* DRJN, DSRJN. Plaintiffs object to Exhibits 1-A, 1-B, and 1-C. *See* ECF No. 43-1. Plaintiffs also object to Exhibit 12. *See* ECF No. 50.

Plaintiffs ask this Court to judicially notice Exhibit A, this Court's Order in the Lead Case Granting in Part Motions to Consolidate Cases for Pretrial Purposes, Granting Request for Judicial Notice, Granting in Part Motion to Dismiss, Creating Consolidated Action with New Caption, and Staying Consolidated Actions. *See* PRJN. Defendants do not object to the PRJN.

Turning first to Defendants' Exhibits 1-A, 1-B, and 1-C, to which Plaintiffs object, the Court takes judicial notice of these Exhibits but not for the facts therein. As to Exhibit 1-A, a "State of the Landfill" report prepared by Defendants, the Court finds that it is available through Defendants' public-facing website, which is available within the Court's territorial jurisdiction. The Court, however, finds that Plaintiffs dispute its authenticity and the facts therein. *See* ECF No. 43-1 at 4 ("Defendants drafted this self-serving State of the Landfill Report, using misleading data and

information to . . . attempt to paint a picture of the Landfill that does not comport with reality . . . . [T]he subsurface chemical reaction is expanding, and the Landfill continues to emit harmful odors and gases . . . ."). Although Defendants argue that Plaintiffs have not raised "factual" dispute, *see* ECF No. 45-7 at 4–6; *see id.* at 5 n.2 (listing the propositions for which Defendants seek judicial notice of Exhibit 1-A), Plaintiffs, as noted above, dispute both the accuracy and *authenticity* of the report, and Defendants have not provided any basis upon which this Court can determine the authenticity of Exhibit 1-A. *See In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d at 1023 (discussing accuracy and authenticity for request for judicial notice purposes). Defendants also argue that the Court may judicially notice Exhibit 1-A as a government document because it is based on government data, ECF No. 45-7 at 7, but as Defendants admit, the report "compiles and synthesizes relevant information," *id.* at 5. Defendants do not provide any authority that compels this Court to find that such synthesized relevant information is equivalent to government data. *See generally* ECF No. 45-7. In light of the dispute over Exhibit 1-A's authenticity and that it contains synthesized relevant information, as opposed to purely raw government data, the Court will take notice of only the existence of Exhibit 1-A but not the facts therein.

As to Exhibits 1-B and 1-C, the Court finds that they do not satisfy Federal Rule of Evidence 201(b) or the incorporation by reference rule. Although courts may take judicial notice of public-facing webpages under Federal Rule of Evidence 201(b), there is a dispute over Exhibits 1-B and 1-C. In particular, Plaintiffs "expressly dispute" the authenticity and accuracy[9] of these Exhibits on the basis that they are "drafted, curated, updated, and produced by Defendants themselves." ECF No. 43-1 at 5; *see id.* at 6 ("[T]here is no foundation, no context, and no authentication of the webpages, which can be updated with no notice [by Defendants]."). Moreover, although Plaintiffs reference Defendants' website in the Complaint, *see, e.g.*, Compl. ¶¶ 21, 54, the facts contained in Exhibits 1-B and 1-C are not central to Plaintiffs' allegations. *See Corinthian Colleges*, 655 F.3d at 999 (explaining that one of the elements to consider is whether "the document is *central* to the plaintiff's

---

[9] As they did in support of Exhibit 1-A, Defendants argue that Plaintiffs do not raise "factual" disputes against Exhibits 1-B and 1-C. ECF No. 45-7 at 6. The Court finds that the same analysis concerning authenticity that the Court used for Exhibit 1-A applies to Exhibits 1-B and 1-C.

claim) (emphasis added). The Court finds that even if all the references to the webpages were removed from the Complaint, Plaintiffs have provided other factual bases upon which they sufficiently allege the Noxious Reaction, the harms caused by it, the government agencies' actions in response thereto, and Defendants' alleged failure to comply with government orders to abate the effects of the Noxious Reaction. Insofar as Defendants have asked the Court to judicially notice Exhibits 1-B and 1-C, the Court will take notice of the existence of the Exhibits. But given Plaintiffs' challenges to them, the Court will not notice the facts therein.

Turning next to Defendants' Exhibits 2 through 11 and 13, the Court takes judicial notice of them and the facts contained therein. The Court finds that it is undisputed that Exhibits 2 through 11 and 13 satisfy Federal Rule of Evidence 201(b) and that they are public documents available through government agencies. *See City of Sausalito v. O'Neill*, 386 F.3d 1186, 1223 n.2 (9th Cir. 2004) (recognizing that courts may take judicial notice of a state agency record that is not subject to reasonable dispute). The Court also finds Plaintiffs relying on them to support their allegations. Compl. at 17–29 (listing government actions in response to the Noxious Reaction); *see Khoja*, 899 F.3d at 1002. Therefore, the Court will take notice of Exhibits 2 through 11 and 13, including the facts therein.

The Court will not take judicial notice of Exhibit 12. As Defendants concede, Exhibit 12 is not an official government record; it is an "exhibit" to a hearing with proposed changes to a government order. *See* ECF No. 45-1 at 3. Defendants do not explain who drafted Exhibit 12. *See id.* Because Defendants have not shown that Exhibit 12 satisfies Federal Rule of Evidence 201(b)'s requirements, the Court cannot determine whether this Exhibit is generally available in this Court's territorial jurisdiction or whether the facts therein can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. As such, the Court will not take judicial notice of Exhibit 12.

Lastly, as to Plaintiffs' Exhibit A, the Court takes judicial notice of it and the facts contained therein, as there is no dispute that it satisfies Federal Rule of Evidence 201(b) and that it is an official court record. *See United States v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980) ("In particular, a court may take judicial notice of its own records in other cases . . . .").

1    As such, the Court GRANTS IN PART the DRJN, GRANTS IN PART the DSRJN, and

2    GRANTS the PRJN. The Court takes judicial notice of Exhibits 2 through 11 and 13 and Exhibit A,

3    including the facts therein. The Court will take judicial notice of Exhibits 1-A, 1-B, and 1-C, but not

4    the facts therein. The Court will not take judicial notice of Exhibit 12.

5                                        **MOTION TO DISMISS**

6        **I.    Applicable Law**

7        A.  Rule 12(b)(6)

8    Rule 12(b)(6) allows an attack on the pleadings for "failure to state a claim upon which relief

9    can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain

10   sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

11   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544,

12   570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the

13   court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*,

14   556 U.S. at 678.

15   The determination of whether a complaint satisfies the plausibility standard is a "context-

16   specific task that requires the reviewing court to draw on its judicial experience and common sense."

17   *Id.* at 679. Generally, a court must accept the factual allegations in the pleadings as true and view

18   them in the light most favorable to the plaintiff. *Park v. Thompson*, 851 F.3d 910, 918 (9th Cir.

19   2017); *Lee*, 250 F.3d at 679. But a court is "not bound to accept as true a legal conclusion couched

20   as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

21   As a general rule, leave to amend a dismissed complaint should be freely granted unless it is

22   clear the complaint could not be saved by any amendment. *See* Fed. R. Civ. P. 15(a); *Manzarek v. St.

23   Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

24       B.  Rule 12(b)(7)

25   A party may move to dismiss an action for "failure to join a party under Rule 19." Fed. R.

26   Civ. P. 12(b)(7). Rule 19 "imposes a three-step inquiry: (1) Is the absent party necessary (i.e.,

27   required to be joined if feasible) under Rule 19(a)? (2) If so, is it feasible to order that absent party to

28   be joined? (3) If joinder is not feasible, can the case proceed without the absent party, or is the

absent party indispensable such that the action must be dismissed?" *Salt River Project Agric. Improvement & Power Dist. v. Lee*, 672 F.3d 1176, 1179 (9th Cir. 2012) (citation omitted). "The Ninth Circuit has held that a court should grant a 12(b)(7) motion to dismiss only if the court determines that joinder would destroy jurisdiction and the nonjoined party is necessary and indispensable." *Biagro W. Sales Inc. v. Helena Chem. Co.*, 160 F. Supp. 2d 1136, 1141 (E.D. Cal. 2001). "A motion to dismiss for failure to join an indispensable party requires the moving party to bear the burden in producing evidence in support of the motion." *Id.* The court may consider evidence outside the pleadings in assessing a Rule 12(b)(7) motion. *Id.*

## II.   Discussion

Defendants move this Court to dismiss the instant action on four grounds: (1) the primary jurisdiction doctrine calls for dismissal without prejudice or a stay of the case; (2) Plaintiffs cannot proceed further because the MCAT Agencies are necessary parties, and they cannot be joined; (3) Plaintiffs seek improper equitable relief; and (4) Plaintiffs have failed to state a claim against Chiquita Inc. and Waste Connections. The Court will evaluate these arguments in turn.

A.   The Primary Jurisdiction Doctrine is Not Applicable.

Defendants argue that the Court should invoke the primary jurisdiction doctrine, refer the matter to the MCAT Agencies, and either dismiss the case without prejudice or stay the case. Mot. at 18–23. In particular, Defendants assert that the MCAT Agencies are better equipped to address the Noxious Reaction than the Court and that the Court inserting itself into the mix would slow down the response to the Noxious Reaction and "only heighten the risk of conflicting obligations." *Id.* 20–21; *see id.* at 23 ("Court processes are inherently slower moving than the agency processes set up to guide the response to the [Noxious Reaction]."). The Court finds that Defendants' arguments rest on a misreading of the Complaint and that the primary jurisdiction does not apply.

The primary jurisdiction doctrine is a prudential doctrine that permits a court to temporarily stay proceedings or to dismiss a complaint without prejudice "*pending* the resolution of an issue within the special competence of an administrative agency." *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008). When a court applies the doctrine, it refers the issue in question to an administrative agency and permits the parties to obtain an administrative ruling from the agency.

*Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042, 1051 (9th Cir. 2000) ("The doctrine gives courts discretion to stay the proceedings, pending referral of the issues to an administrative body."); *Clark*, 523 F.3d at 1115 (explaining that when a district court determines that primary jurisdiction applies, it enables a "referral" of the issue to the relevant agency, which means "the court either stays proceedings or dismisses the case without prejudice, so that the parties may seek an administrative ruling.") In this way, it is similar to other doctrines which counsel courts to avoid duplication of the adjudicative efforts of other bodies, particularly bodies with greater expertise. As a prudential doctrine, there is "no rigid formula" for its application. *Chabner*, 225 F.3d at 1051. Rather, courts are to be guided by the question of whether application of the doctrine would serve its underlying policies, namely:

> 1) whether application will enhance court decision-making and efficiency by allowing the court to take advantage of administrative expertise; and
> 2) whether application will help assure uniform application of regulatory laws.

*Id.* The Ninth Circuit has made clear that:

> It is not, as we have emphasized, a doctrine that "require[s] that all claims within an agency's purview to be decided by the agency." "Nor is it intended to 'secure expert advice' for the courts from regulatory agencies every time a court is presented with an issue conceivably within the agency's ambit."

*Syntek Semiconductor Co. v. Microchip Tech. Inc.*, 307 F.3d 775, 780 (9th Cir. 2002) (internal citations omitted).

Accordingly, the Ninth Circuit has held that the doctrine is properly invoked in the following situations: where the claim "requires resolution of an issue of first impression," *id.*; where the claim requires resolution "of a particularly complicated issue that Congress has committed to a regulatory agency," *id.*; or where "protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme." *Clark*, 523 F.3d at 1114.

"[C]ourts in considering [whether to invoke primary jurisdiction] have traditionally employed such factors as (1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that

1    subjects an industry or activity to a comprehensive regulatory authority that (4) requires expertise or

2    uniformity in administration." *Syntek*, 307 F.3d at 781.

3        The Court finds that application of the primary jurisdiction doctrine is not warranted here. It

4    does not present any of the three situations where the Ninth Circuit has held that the doctrine is

5    properly invoked, and to the extent it does, application of the doctrine would not further either of the

6    underlying policy rationales for the doctrine.

7        *1. The Claims in the Complaint Do Not Require Resolution of An Issue of First Impression.*

8        First, the claims in the Complaint do not require resolution of an issue of first impression

9    within the meaning of *Syntek*. Plaintiffs sufficiently allege that the issues related to the Noxious

10   Reaction are not of first impression, as the MCAT Agencies are familiar with the effects of the

11   Noxious Reaction and have been investigating and issuing orders to Defendants to address it for at

12   least two years.[10] Compl. at 17–29 (listing government actions in response to the Noxious Reaction);

13   *contra Clark*, 523 F.3d at 1113, 1115 (affirming trial court's referral to the FCC because "whether a

14   [voice over internet protocol, or VoIP] provider meets the definition of telecommunication carriers

15   under 47 U.S.C. § 258(a) "has never been resolved").

16       *2. The Claims in the Complaint Do Not Require Resolution of Complex Issues Dedicated to*
         *Agencies, and Application of the Doctrine Would Not Further Either Recognized Policy*
17       *Rationale.*

18       Second, the claims do not require the resolution of complicated issues dedicated to a

19   regulatory agency. The primary questions presented by Plaintiffs' claims are: (1) are Defendants

20   liable for a "public nuisance" under California law, and (2) if so, what is the appropriate remedy for

21   that public nuisance. The determination of whether the conditions constitute a public nuisance and

22   whether Defendants are liable for any such nuisance are not issues dedicated to a regulatory agency.

23   Defendants do not contend otherwise. At best, the Court's determination of an appropriate remedy,

24   should it find Defendants liable for a public nuisance, could require the Court to resolve some

25   complicated issues otherwise dedicated to a regulatory agency. For example, the determination of

26   how best to stop the geysers of leachate is properly considered a complicated issue otherwise

27

28   [10] Moreover, Defendants do not rely on the "first impression" prong of the primary jurisdiction doctrine. *See generally* Mot.

dedicated to a regulatory agency. But even assuming this is so and that this case therefore presents one of the situations where the Ninth Circuit has held the doctrine may be properly invoked, a stay or dismissal would not further the underlying policy principles, and therefore this Court declines to apply it.

Application would not promote the "administrative expertise" policy consideration. Referral to the MCAT Agencies makes no sense where they are already involved and therefore a stay would not engage their expertise in a way that it is not currently being engaged. To the extent that the Court needs the MCAT Agencies' expertise to determine an appropriate remedy, it appears the current posture provides ample opportunity for the Court to take advantage of this expertise. Similarly, application would not assure uniform application of regulatory laws, the other recognized policy rationale for the doctrine. It does not appear that Plaintiffs are seeking to have the Court determine the meaning of regulations that these agencies have primary responsibility for in the way that the parties did in *Syntek* or *Clark*. In *Syntek*, the question before the court was whether decompiled object code qualified for registration as source code under the Copyright Act and regulations. *See Syntek*, 307 F.3d at 779–80, 781. In *Clark*, the question before the court was whether the federal prohibition on telecommunications "slamming" applied to VoIP providers. *See Clark*, 523 F.3d at 1112–13. How these Defendants should remediate this particular Noxious Reaction at this particular Landfill is not a similar question.

Defendants' argument appears to be based on a misreading of the Complaint. Defendants raise the concern that this Court may usurp the MCAT Agencies' authority and create inefficiencies: "Were the Court to take remedial responsibilities *onto its own shoulders*, it would need to fashion and oversee the implementation of a technical remedy that could quickly become ineffective as response needs at the site continuously change." Mot. at 20 (emphasis added); *see id.* 20–21 ("[A]ssumption of oversight by the Court at this stage could result in 'conflicting orders of both the Court and the administrative agen[cies].'"). But Plaintiffs are not asking this Court to take over the MCAT Agencies' role in determining the next steps in abating the Noxious Reaction. Rather, Plaintiffs seek to have this Court *strengthen* the agencies' authority by ordering Defendants to comply with the agencies' abatement orders. *See* Compl., Prayer for Relief ¶ 1 (seeking injunction

1  ordering "Defendants to bring the Landfill into compliance with the Los Angeles County Code, the

2  operative CUP, and all applicable laws and regulations of the various local, state, and federal

3  regulatory entities"); *id.* ¶ 109 ("Remediation measures taken by Defendants in response to [the

4  MCAT] entities' orders have not been sufficient, and Defendants have not properly controlled the

5  Noxious Reaction or mitigated its effects."). Plaintiffs point out in their Complaint and in their

6  Opposition that the MCAT Agencies have largely already made the technical and policy

7  determinations to address the Noxious Reaction but that their enforcement actions have been

8  "without success" because of Defendants' failure to comply with their orders.[11] Opp'n at 14; *see*

9  Compl. ¶¶ 79, 80, 84, 92, 94, 105, 109. In light of these allegations, the Court finds Defendants'

10  concern over inefficiency and "conflicting orders" unfounded and therefore an insufficient

11  justification for application of the primary jurisdiction doctrine.[12]

12      *3. Protection of the Integrity of The Regulatory Scheme Is Not at Issue.*

13      Third, neither a stay nor dismissal is required to protect the integrity of the regulatory

14  scheme. As discussed above, Plaintiffs are seeking to strengthen the authority of the administrative

15  agencies and ensure compliance with their orders, not have this Court take their place.

16      Put another way, the Court acknowledges that the MCAT Agencies have superior expertise

17  in determining in the first instance what technical remedial actions are appropriate at the Landfill. (It

18

19  [11] At the hearing, Defendants argued that the Complaint does not contain any allegation that the MCAT
20  Agencies' efforts to address the Noxious Reaction have been unsuccessful because of Defendants' failure to
    comply with agency orders. Defendants also argued that Plaintiffs seek more than this Court strengthening the
21  MCAT Agencies' authority, as the agencies' orders are subject to ongoing revisions, which would require this
    Court to interpret the meaning of those orders and determine their propriety and effectiveness. But the Court
22  finds that these arguments would require this Court to read the allegations and make inferences in
    *Defendants*' favor, not in Plaintiffs' favor, despite the case currently being at the motion to dismiss stage. As
23  such, the Court's conclusion regarding primary jurisdiction will remain unchanged.

24  Moreover, during the hearing, Plaintiffs clarified that this Court's reading of their Prayer for Relief—that they
    request this Court supplement, not supplant, the MCAT Agencies' authority—is correct. In particular,
25  Plaintiffs made clear that they are not asking this Court to insert itself into the MCAT Agencies' independent
    efforts to address the Noxious Reaction in the future.  Where a decision falls within the MCAT Agencies'
26  authority and expertise, Plaintiffs do not seek to have this Court make its own independent decision. The
    Court intends to hold the Plaintiffs to this representation.
27  [12] Defendants assert that "obey the law" injunctions are disfavored and characterize the requested injunctive
    relief as such an injunction. Reply at 5. Defendants have pointed to no authority indicating that it is disfavored
28  for a court to require a party to comply with the order of an administrative agency. This, in fact, seems to be
    the essence of court enforcement of administrative decisions.

1   appears undisputed that they do not have superior expertise with respect to relocation and the other

2   forms of relief sought.) To the extent that the parties dispute whether a specific remedial action

3   should be taken—e.g., two wells versus three—and the MCAT Agencies are in the process of

4   deciding such a question, the Court agrees that a limited stay may at some point be appropriate. But

5   this hypothetical actually demonstrates why the dismissal sought by Defendants is particularly

6   unsuited to this case. If, in the hypothetical, the parties agree that the MCAT Agencies' decision

7   should be followed, a brief stay would be warranted to obtain the MCAT Agencies' decision, but

8   dismissal would be unjustified. If, in the same hypothetical, the parties do not agree that this Court

9   should defer to the MCAT Agencies' decision, then again dismissal would be unjustified, and

10  perhaps even a stay would be unnecessary. Defendants have not explained how dismissal would be a

11  superior method of this Court taking advantage of the MCAT Agencies' expertise.

12      *4.  Much of the Relief Sought Does Not Fall Within the Agencies' Purview at All.*

13          Moreover, the Court finds that Plaintiffs' other requested forms of injunctive relief are not

14  within the MCAT Agencies' purview and therefore application of the primary jurisdiction doctrine

15  would be particularly inappropriate. Plaintiffs ask this Court to order Defendants to subsidize

16  relocation of affected residents and to subsidize other remedial measures for the affected residents

17  (e.g., air purifiers and filtration systems). Plaintiffs also ask this Court to impose a receivership if

18  Defendants are unable to comply with the orders and relevant law. Finally, Plaintiffs ask this Court

19  to order Defendants to pay civil penalties, attorneys' fees and costs. *See* Compl., Prayer for Relief.

20  Defendants advance no argument that the MCAT Agencies are better equipped to grant these forms

21  of relief than this Court. *See generally* Mot. Rather, Defendants appear to agree that this Court is the

22  proper avenue through which such relief can be granted. *See id.* at 21 ("Public bodies like the

23  County may bring public nuisance claims when necessary . . . . The County's ability to seek punitive

24  civil penalties and attorneys' fees under its municipal code is only ancillary to this authority."). As

25  such, the Court finds that this Court, not the MCAT Agencies, is the proper forum to seek the

26  injunctive relief that Plaintiffs seek in this case, making application of the primary jurisdiction

27  doctrine inappropriate.

28

In sum, the Court declines to apply the primary jurisdiction doctrine and DENIES the Motion on this ground.[13]

B.  <u>The MCAT Agencies Are Not Necessary and Indispensable Parties.</u>

In the alternative, Defendants argue that the MCAT Agencies should be joined because if not, "the MCAT Agencies will be unable to protect their rules and orders from invalidation or frustration by an injunction issued by the Court." Mot. at 25. The Court finds Defendants' argument unavailing.

As noted earlier, Rule 19 imposes a three-step inquiry: "(1) Is the absent party necessary . . . under Rule 19(a)? (2) If so, is it feasible to order that absent party to be joined? (3) If joinder is not feasible, can the case proceed without the absent party, or is the absent party indispensable such that the action must be dismissed?" *Salt River Project Agric. Improvement & Power Dist.*, 672 F.3d at 1179. Here, Defendants have not shown that the MCAT Agencies are such necessary parties that a proper resolution of this action would not be feasible without them as parties in the case. There is no allegation that the MCAT Agencies are in any way responsible for the Noxious Reaction, and Plaintiffs have sufficiently alleged that the MCAT Agencies have been investigating and working toward addressing the Noxious Reaction for more than two years. Defendants do not dispute that the MCAT Agencies are taking proper steps. Similarly, Defendants have not explained why the Court needs the MCAT Agencies to determine the other aspects of the case, such as whether the Noxious Reaction constitutes a public nuisance or whether the other forms of injunctive relief that Plaintiffs seek are appropriate. Absent such a showing, the Court does not find the MCAT Agencies necessary

---

[13] At the hearing, Defendants indicated that a stay of the case solely as to the first Prayer for Relief might be appropriate. When asked what the practical effect of that stay would be, Defendants indicated it would eliminate or narrow discovery into (1) the communication between Defendants and the MCAT Agencies and (2) expert opinions. But the County *is* one of the MCAT Agencies, and Defendants' experts are already working with the MCAT Agencies (one of whom is the County) regarding the agency orders. As such, the Court sees no need to eliminate or narrow discovery into these issues, and therefore finds that such a stay is not warranted.

Defendants also argued that a stay would preclude this Court from interfering with the MCAT Agencies' efforts on addressing the Noxious Reaction. But as the Court pointed out and Plaintiffs clarified during the hearing, Plaintiffs do not seek to have this Court insert itself into MCAT Agencies' work. As such, the Court finds this argument unavailing.

1   for this action. And having found that Defendants have failed to satisfy the first step of the Rule 19

2   inquiry, the Court need not reach the other steps, nor need it reach Defendants' immunity argument.

3   *See* Mot. at 27–29.

4        Because Defendants have failed to show that the MCAT Agencies are necessary and

5   indispensable parties without whom the Court's orders, if any, would be frustrated, the Court

6   DENIES the Motion on this ground.

7      C.  <u>The Requested Abatement Funds May Be Proper.</u>

8        Defendants argue that Plaintiffs' request for abatement funds—i.e., subsidies for relocation

9   as well as for remedial measures, such as air purifiers, air filtration systems, double paned windows,

10   home hardening, and utility bill assistance—are improper forms of relief. Mot. at 29–31.

11   Emphasizing that the unlawful activity in this case is the Noxious Reaction that emits harmful odors,

12   Defendants assert that "[o]rdering Defendants to pay for the relocation of thousands of individuals—

13   or modifications to their homes—will have no effect on whether the reaction continues generating

14   odors." *Id.* at 30. Plaintiffs respond that a Rule 12(b)(6) motion is an inappropriate way to challenge

15   the abatement funds and that the requested relief is proper. Opp'n at 17–20.

16        Civil Code section 3491 provides that the "remedies against a public nuisance" include

17   "[a]batement." "An abatement of a nuisance is accomplished in a court of equity by means of an

18   injunction proper and suitable to the facts of each case." *People v. Padilla-Martel*, 78 Cal. App. 5th

19   139, 151 (2022) (internal quotation marks omitted). "It is a familiar doctrine of equity that the scope

20   of [an] injunction will be limited to the wrongful act sought to be prevented." *Id.* "In fashioning a

21   remedy, a court should strive for the least disruptive remedy adequate to its legitimate task and tailor

22   it to the harm at issue." *Id.*

23         An equitable remedy's sole purpose is to eliminate the hazard that is causing
        prospective harm to the plaintiff. An equitable remedy provides no compensation

24        to a plaintiff for prior harm. Damages, on the other hand, are directed to
        compensating the plaintiff for prior accrued harm that has resulted from the

25        defendant's wrongful conduct. The distinction between these two types of remedies
        frequently arises in nuisance actions. Generally, continuing nuisances are subject

26        to abatement, and permanent nuisances are subject to actions for damages.

27   *People v. ConAgra Grocery Prods. Co.*, 17 Cal. App. 5th 51, 132–33.

28

As an initial matter, the Court finds that Defendants may seek to dismiss Plaintiffs' requests for abatement funds through a Rule 12(b)(6) motion. *See Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974 (9th Cir. 2010) (where a party seeks to preclude damages from the complaint as a matter of law, such an attempt is "better suited for a Rule 12(b)(6) motion or a Rule 56 motion"). As such, the Court will evaluate whether Plaintiffs' request for abatement funds are properly sought.

The Court finds that Plaintiffs' requests for relocation and remedial measures may be "suitable to the facts of [this] case." *See Padilla-Martel*, 78 Cal. App. 5th at 151. For clarity, the Court finds that Plaintiffs do not seek compensation for the harm already done to the residents near the Landfill; rather, Plaintiffs seek to temporarily lessen the impact of the Noxious Reaction on the residents while it is being extinguished. *See* Compl., Prayer for Relief ¶¶ 2, 3. And this Court has broad powers to determine appropriate remediation. *ConAgra*, 17 Cal. App. 5th at 133 (recognizing courts' "broad discretion to fashion an appropriate abatement injunction"). Defendants rely on *ConAgra* to argue that an equitable remedy should eliminate the hazard that is causing prospective harm to the plaintiff and not the effect on the plaintiff. *See* 17 Cal. App. 5th at 132–33. But even in *ConAgra*—where the public nuisance was lead paint, and the defendants were liable due to their promotion of lead paint despite its risks—the abatement remedy included some activities not strictly limited to removing the paint. *People v. Atlantic Richfield Co.*, No. 100CV788657, 2014 WL 1385823, \*60–\*61 (March 26, 2014) ("The Jurisdiction shall conduct a public education and social marketing campaign to engage the citizens, building owner, construction, and lead mitigation and inspection. . . . Remediation limited to interior surfaces results in an estimated cost of remediation of $759,284,467, or approximately $750,000,000. Education expenses are included in these figures."); *ConAgra*, 17 Cal. App. 5th at 134 ("While the trial court's order in this case may be unusual in requiring defendants to prefund remediation costs, it was well within the court's discretion."). For instance, the remedy included education and outreach. The remedy also included other activities such as containment of the lead paint where that was more appropriate than removal. So it is clear that this Court is not bound by an overly rigid and narrow definition of abatement. Here, it is clear that complete extinguishment of the Noxious Reaction will take quite some time. It seems well within this Court's broad equitable powers to ensure that the residents are protected from the

Noxious Reaction during that period; this is closely related to extinguishment of the Noxious Reaction itself and part and parcel of addressing the heart of the nuisance—the migration of gases and fumes to the residents.  Just as the Court in *ConAgra* found containment of lead paint an appropriate remedy, this Court finds that temporary relocation of residents or temporary provision of remediation is appropriate. In fact, it is hard to understand how Defendants can argue that this Court can order covering of the Landfill to stop the emission of noxious odors, but cannot order filtration systems to stop the noxious odors from reaching the residents in their homes.[14]

To the extent that Plaintiffs are seeking permanent relocation of the residents, however, the Court would tend to agree that this appears to be far afield from abatement of the nuisance and closer to damages for the harm that the nuisance has caused, and therefore not permitted.

Accordingly, the Court GRANTS the Motion IN PART and limits the prayer for an abatement fund for relocation expenses to temporary relocation expenses only.

D.  Plaintiffs Have Sufficiently Pleaded Claims Against Chiquita Inc. and Waste Connections.

Defendants argue that Chiquita Inc. and Waste Connections should be dismissed because Plaintiffs make only conclusory allegations about them. Mot. at 31–34. In particular, Defendants highlight that only Chiquita LLC has been issued the operative CUP and that Plaintiffs "improperly lumps Defendants together." *Id.* at 33. Plaintiffs respond that they have made sufficient allegations as to each entity and that that the Court has already ruled on this issue in the Lead Case by not dismissing Chiquita Inc. and Waste Connections there. Opp'n at 20–21.

The Court finds that at the current motion to dismiss stage, the analysis that the Court has employed in the Lead Case applies here. Drawing all inferences in Plaintiffs' favor, the Court finds that Waste Connections is the sole owner of Chiquita Inc., which is turn is the sole member of Chiquita LLC. Compl. ¶¶ 18, 19. Plaintiffs further allege that Waste Connections exercises "significant control" over general management and daily activities at the Landfill. *Id.* ¶¶ 17, 21. Plaintiffs also allege that Waste Connections's employees operate the Landfill and represent the

---

[14] In this light, the Court finds Plaintiffs' request for the Court's order to Defendants to comply with the MCAT Agencies' orders and notices aligned with the purpose of equitable remedies, as it is tailored to eliminating the emission of noxious odors, i.e., the Noxious Reaction itself.

Landfill before regulatory and governmental entities. *Id.* ¶21. As the Court noted in the Lead Case, discovery may or may not uncover evidence of Waste Connections and Chiquita Inc.'s involvement with the management and operations of the Landfill. *See* Lead Case, ECF No. 94 at 28. But at this stage, the Court finds Plaintiffs' allegations sufficient to proceed.[15]

As such, the Court DENIES the Motion with respect to Defendants' request to dismiss Chiquita Inc. and Waste Connections.

## CONCLUSION

For the foregoing reasons, the Court hereby ORDERS as follows:

1. Defendants' Request for Judicial Notice, ECF 33-2, is GRANTED IN PART, and Defendants' Supplemental Request for Judicial Notice, ECF No. 45-1, is GRANTED IN PART.

    a. The Court will take judicial notice of Exhibits 1-A, 1-B, and 1-C but not the facts therein.

    b. The Court takes judicial notice of Exhibits 2 through 11 and 13 and the facts therein.

    c. The Court will not take judicial notice of Exhibit 12.

2. Plaintiffs' Request for Judicial Notice, ECF No. 43-3, is GRANTED.

    a. The Court takes judicial notice of Exhibit A and the facts therein.

3. Defendants' Motion to Dismiss is GRANTED IN PART, and the Court LIMITS any request for relocation subsidies in the Prayer for Relief to temporary relocation only.

**IT IS SO ORDERED.**

Dated: May 30, 2025

MAAME EWUSI-MENSAH FRIMPONG

United States District Judge

---

[15] At the hearing, Defendants pointed to the higher level of specificity in the Lead Case's allegations regarding Waste Connections and Chiquita Inc. But the fact that the operative Complaint in the Lead Case contains more specific allegations does not make the allegations in this case's Complaint necessarily insufficient. The Court's conclusion is that the allegations in this complaint are sufficient under applicable law.

25